## WARE v. SOUTHERN KRAFT CORPORATION.

### No. 5876.

Court of Appeal of Louisiana. Second Circuit.

April 28, 1939.

Rehearing Denied May 29, 1939.

Dhu Thompson, of Monroe, and R. H. Hope, of Bonita, for appellant.

Madison, Madison & Files, of Bastrop, for appellee.

DREW, Judge.

This is a suit under the Employers' Liability Act of this state. Act No. 20 of 1914. Plaintiff alleged that on or about April 12, 1937, while in the employ of defendant and acting in the course and scope of his employment, he was carrying a sack of starch, weighing approximately 200 pounds, up a stairway when he missed a step; and as a result thereof he fell and injured his back and spine and the muscles, ligaments and soft tissues of his body; that the accident was reported to the foreman of his department and plaintiff was sent to defendant's doctor for treatment. He alleged his weekly wage at the time of the accident was $15.12, and he was employed to work 7 days a week. He further alleged that he has never recovered from the injuries received in said accident and is totally and permanently disabled from performing work of any reasonable character. He prayed for judgment for sixty-five per cent of his weekly wage for a period not to exceed 400 weeks.

Defendant in answer denies that plaintiff was injured in the accident as alleged by him, and contends that any disability from which plaintiff suffered was due to sickness caused otherwise than from an accidental injury. It admitted that plaintiff did make a report of an accident to his foreman and that the foreman gave him an order to visit the company's doctor. Although it denied owing plaintiff anything, as a precautionary measure and giving plaintiff the benefit of all doubt, it tendered to him compensation in the amount of $165.14, and all court costs up to date of tender, the tender representing sixty-five per cent of plaintiff's wages for a period of 16 weeks. The tender was refused as a final settlement.

The lower court awarded plaintiff judgment for the amount tendered and ordered the court cost paid by defendant up to the time of tender.

From that judgment, plaintiff prosecutes this appeal.

Plaintiff is a negro man 33 years of age. He had been in the employ of defendant company for approximately 10 months. He testified that he was carrying a sack of starch, weighing about 200 pounds, up a stairway when he slipped. He dropped the

starch and caught the banisters with his hands and kept himself from falling down the steps; that he felt pain in his back, all the way from the small of his back up to his shoulders; that one of his fellow employees picked up the starch and carried it up for him; that he descended to the room where he worked and sat down; that he soon thereafter reported the accident to his foreman, who gave him an order for hospitalization. He did not immediately go to the doctor, but remained on the job, not working, for several hours, until quitting time, when he went to the clinic and was examined by the company doctor. Heat applications were given to his back and he went home.

He is corroborated as to the near fall by his fellow employee. One other employee testified that plaintiff told him he had hurt his back, immediately after the occurrence; that plaintiff attempted to roll a wheelbarrow of lime and was forced to quit; that he rolled it to its destination for plaintiff; that plaintiff did no other work that afternoon; and that he heard him make the report to his foreman. He did not hear everything said, but did hear him tell the foreman that he slipped and fell when attempting to roll a wheelbarrow loaded with lime. The foreman testified that the only accident plaintiff claimed when making his report was that he made a run with a wheelbarrow and got a catch in his side. The foreman asked him if he wanted to go to a doctor and plaintiff said he would wait until the end of the shift. There is no evidence by plaintiff or any other witness that he slipped while rolling the wheelbarrow.

There was one physician, used by plaintiff, who testified that he examined plaintiff eight months after the alleged accident and made several X-rays of the entire spine. His interpretation of these X-rays is that there is a chipped fracture of the fourth lumbar vertebra and a fracture of the fifth lumbar vertebra extending through the sacrum into the sacro-iliac joint; and a disturbance, by widening of the right sacro-iliac joint. He also found the muscles of plaintiff's back on the right side were rigid, spastic, and held tense.

Plaintiff testified that his back hurt him constantly and that he was unable to perform any manual labor; that the only work he had done since the accident was to occasionally carry a small package from a store, where he loafed most of the time, out to a car, an accommodation to the storekeeper who was kind to him and who had helped him since he received his injury.

Defendant placed upon the witness stand the man in charge of the Louisiana Unemployment Insurance Office, at Bastrop, Louisiana, who produced documents showing that plaintiff had applied for and received pay through that office. The applications were signed by plaintiff and in said applications he had answered in the negative the question of whether his unemployment was due to accidental injury. He also stated in the applications that he was able and willing to work. He also filed sworn statements showing small earnings for each week, ranging from 50 cents to $1. Plaintiff denied earning anything and swore that the statements of earnings were false. He explained his answer to the questions regarding accidental injury not being the cause of his unemployment, by showing he did not fill out the application, but that it was done by the man in charge of the office, and that he signed it without knowing its contents.

Plaintiff's alleged injury occurred on April 12, 1937. On May 20, 1937, Dr. Garnier examined him and operated on him for acute appendicitis. The operation revealed an unusual appendix. It was down against the source muscles and carried up 6½ to 7 inches. The original incision had to be enlarged in order to remove the appendix. The case developed a wound infection and plaintiff was kept in the hospital for several weeks. Dr. Garnier also saw plaintiff prior to May 20, 1937, and saw him last on April 4, 1938. He is positive that plaintiff never complained to him of his back until April 4, 1938, after suit was filed, and then his complaint was of the upper part of his back, between his shoulders and back of his chest. He could find no evidence of back injury. The only thing he could find wrong with plaintiff was an unhealed fistula. He examined, in the shadow box in court, the X-rays which plaintiff's doctor testified about, and he is positive they do not disclose any fractures or widening of the sacro-iliac joint. He testified that plaintiff's appendix could have caused pain in his back; that the accident could not and did not cause the acute appendicitis.

Dr. Ogden testified that he just saw plaintiff on the evening of April 12, 1937. He was complaining then of generalized aches and pains over his body, had a little fever and was feeling bad. He made no

mention of an accident at the mill. This physician made a diagnosis of malaria and gave him a prescription for same. He further testified,—

"A. * * * I saw him next a couple of days later. He came in on the 14th, and I saw him about every other day after that until he was operated on on May 20th. I also made an examination. He came back in about a week and he said he had pains in his joints, and he still had some fever, and he was still feeling bad, so I made an examination of his urine. Found pus in his urine. So I treated him for pyelitis. I also put him under the zoalite. He said his back was hurting him some at that time about a week later—he made no special mention of it—and I put him under the light, most every day. Then about a week before he was operated on he began to complain of pain in his right side. I thought he was ready to go back to work about a week before he was operated on but he complained of pain in his right side and I sent him home and told him to stay in bed with an ice bag on his right side and if it didn't get any better to let me know. So he was operated on and stayed in the hospital several weeks on account of a stitch abscess. When he went home the wound was still draining and he came back often to have it treated. That healed and we wanted to send him back to work again and he had a fistula. I treated that a while and it didn't seem to get any better and I told him he should have an operation, and he went to Charity. I didn't see him for a good while. Then he came back, and the next complaint, he started complaining of pain in his chest, and he was having some fever at that time, a little cough, and he was losing weight. I examined him all over again and made a diagnosis of bronchitis. I treated him for that. I kept treating him. I wanted to put him back to work and he said he couldn't. So I thought, around in November it was, after treating him for a good while—

"Q. November, 1937? · A. Yes, sir—in November I thought maybe I was prejudiced against Dennis and maybe I had better let someone else examine him. I couldn't find anything wrong except a little cold in his chest and this fistula had recurred, but I didn't see why that should keep him from work, so I had Dr. Rawls examine him for me. I didn't see Dennis any more after that.

"Q. At the time that Dr. Rawls examined Dennis, wasn't he trying to get permanent and total disability from the Metropolitan? A. Yes, he was. He brought the blank down there for me to fill, for permanent and total disability, and I refused to do it. I told him I couldn't find any reason for it, but I didn't want to be prejudiced and I asked Dr. Rawls to examine him."

Dr. Ogden further testified that if plaintiff had complained to him of an accident at the mill he would not have treated him, but would have turned him over to Drs. Garnier or Poimboeuf, who handled all such cases.

Dr. Ogden filled out for plaintiff a number of reports to the insurance company, which carried insurance on the employees of defendant and only paid when illness was not due to accident. Plaintiff received from the insurance company such benefits for 26 weeks.

Dr. Ogden X-rayed plaintiff's back and is positive there is no injury of any kind there, and plaintiff at no time ever complained of his back other than general back ache. He treated plaintiff from April 12 to November, 1937, during which time he treated him for malaria, pyelitis, appendicitis, with post operative abscess, fistula and bronchitis, none of which was caused by trauma. The first time he used the zoalite on plaintiff's back was May 12, 1937, one month after he began treating him.

Dr. Rawls examined plaintiff just prior to the appendectomy and assisted in the operation. He also examined him on November 14, 1937. Plaintiff made no complaint of his back at that time. Dr. Rawls made a complete examination of plaintiff on November 14th, and the only thing he found was a recurrent fistula anus. There was no rigidity of the muscles of the back and no tenderness. Plaintiff at no time mentioned to him anything about an accident. The X-rays fail to reveal any pathology in the spine or back.

Dr. Rodgers first examined plaintiff for the insurance company on June 28, 1937. Plaintiff complained of a back injury at that time. He found some slight stiffness of his back, more of a general nature. The symptoms were more subjective than objective as far as the physician could determine. He examined plaintiff again on October 11, 1937. He made no complaint of his back at that time. The doctor was of the opinion at that time that plaintiff would be able to go

back to work by October 25, 1937; that the fistula should be entirely well by then. He found no other cause to prevent plaintiff from working at that time. He again examined plaintiff in April, 1938, after his suit was filed. He complained of pains running up and down his back between the shoulder blades; that the fractures claimed by Dr. Mosely, who testified for plaintiff, could not have caused the pains in the locality complained of by plaintiff at that time. He examined the X-ray testified from by Dr. Mosely and found no evidence of fracture.

There is some other lay testimony in the record which we deem unnecessary to relate here, as it cannot have any effect on a decision of this case.

The lower court found under the evidence that defendant was not liable for compensation, and we are not prepared to say there is any error in its judgment. Plaintiff has not made out his case with that degree of certainty required by law.

The judgment of the lower court is therefore affirmed with costs.